**UNITED STATES of America**

v.

**Juan CUEVAS and Jose Cuevas, Defendants.**

**No. S2 98 Cr. 1053(JSR).
No. 05 Civ. 1530(JSR).**

United States District Court, S.D. New York.

Dec. 12, 2005.

Stanley Hochberg, Brooklyn, NY, Uzmah Saghir, Attorney at Law, New York, NY, for Defendants.

David C. Esseks, Assistant United States Attorney, Mary Jo White, United States Attorney, New York, NY, for Plaintiff.

*OPINION AND ORDER*

RAKOFF, District Judge.

This Opinion and Order will dispose of all remaining matters in this case.

By way of background, in October 2002 defendants Juan Cuevas ("Juan") and Jose Cuevas ("Jose") pleaded guilty to a three-count indictment charging them with conspiracy to distribute cocaine, conspiracy to launder money, and substantive money laundering. Juan was sentenced to 390 months' imprisonment, and Jose was sentenced to 240 months' imprisonment. Juan, on appeal from his sentence, argued that his extradition from the Dominican Republic was conditioned on his not being sentenced to more than 30 years' imprisonment (*i.e.* 360 months). The Court of Appeals remanded for further factual findings, concluding that "there is insufficient evidence in the record to discern whether the United States and the Dominican Republic reached an agreement as to the sentence that could be imposed upon Cuevas." *United States v. Cuevas*, 112 Fed. Appx. 806 (2d Cir.2004). Meanwhile, Jose moved, pursuant to 28 U.S.C. § 2255, to vacate his conviction, primarily on the ground that if he had known of the alleged 30–year limit, he would not have pleaded guilty.

Subsequent to the remand of Juan's appeal and the filing of Jose's motion, the Court conducted several hearings and received substantial written submissions from the parties. Based on these hearings and submissions, the Court makes the following findings:

On August 13, 1999, the U.S. Embassy in the Dominican Republic requested, by diplomatic note number 116, that the Dominican Republic arrest Juan and Jose (as well as one Pablo Sena) in anticipation of their extradition. *See* Declaration of Mary Ellen Warlow, Director, Office of Interna-

tional Affairs, Department of Justice ("Warlow Decl."), dated July 8, 2005, at ¶ 3. On November 19, 1999, by diplomatic note number 165, the United States transmitted to the Dominican Republic the formal documentation in support of the extradition request, including an affidavit of David C. Esseks, Assistant U.S. Attorney, S.D.N.Y, which, *inter alia,* disclosed the potential penalties under U.S. law for the offenses charged. *See* Warlow Decl. at ¶ 4. The extradition request was made pursuant to a bilateral extradition treaty, *see* Convention for the Mutual Extradition of Fugitives from Justice, U.S.-Dom. Rep. ("Extradition Treaty"), June 19, 1909, 36 Stat. 2468, and pursuant to the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances ("U.N. Convention"), art. 6, Dec. 19, 1988, 28 I.L.M. 493.[1]

The Government of the Dominican Republic, by diplomatic note DEI–99–1349, dated November 29, 1999, acknowledged receipt of the extradition request. *See* Warlow Decl. at ¶ 5. After considerable delay, Juan and Jose were transferred, on July 6, 2002, to the custody of the United States Marshal and transported to the United States. *See* Warlow Decl. at ¶ 6.

Aside from the correspondence detailed above, there was no further diplomatic communication between the United States and the Dominican Republic concerning this case. *See id.* However, on July 18, 2002, almost two weeks after taking custody of the defendants, the United States received a copy of an extradition decree dated July 2, 2002. *See id.;* Declaration of Linda Jacobson, Assistant Legal Adviser, Department of State ("Jacobson Decl."), dated July 11, 2005 at ¶ 6 ("The Embassy has no record of receiving a Presidential Decree from the Government of the Dominican Republic prior to or at the time of Juan and Jose Cuevas' extradition."). That decree stated, in relevant part, that "it is understood that the above-named [defendants] are covered by the Provisions of Article 4, Paragraph II of Law number 489." Dom. Rep. Extradition Decree 495–02, July 2, 2002. Law number 489, in turn, provides, "In extradition treaties signed by the Dominican State with other States, when the extradition of a national is granted, no penalty greater than the maximum established in this country, which at the moment this law enters into force is thirty years, shall be imposed." Dom. Rep. Extradition Law, No. 489, art. 4, para. II (1969), *amended by* Dom. Rep. Law No. 278–98 (1998).

Against this factual background, the issue regarding Juan is whether the extradition decree, which explicitly states its understanding that Juan is "covered" by Law number 489, constitutes an agreement between the two governments, and therefore prohibits this Court from imposing a sentence in excess of thirty years' imprisonment. *See United States v. Baez,* 349 F.3d 90 (2d Cir.2003) ("Based on international comity, the principle of specialty generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country.").[2] It is clear that the United States never expressly agreed to the purported condition; indeed, the United States was not even aware of the purported condition until after the United States had already taken

---

**1.** The Convention is a multilateral treaty, under which the United States and the Dominican Republic (among others) agreed that certain drug offenses not contemplated by the Extradition Treaty, including those for which Juan and Jose were charged, qualify as extra-ditable offenses under the Extradition Treaty. See U.N. Convention, art. 6.

**2.** The parties are agreed that neither the Extradition Treaty nor the U.N. Convention restrict the sentence the Court may impose.

custody of Juan and Jose. *See* Warlow Decl. at ¶¶ 9–10; Jacobson Decl. at ¶ 6. Prior to the transfer of custody, the two countries exchanged exactly three diplomatic notes concerning the matter, none of which addressed the condition set forth in the extradition decree.

Juan's argument, therefore, reduces to the claim that the Government somehow agreed to be bound by a condition it only learned of after taking custody. Nothing in the record, however, supports such an unlikely assertion, which, on its face, is contrary to ordinary diplomatic custom. Ordinarily, the protocol for requesting and approving conditions ón extradition is quite formal: the foreign country formally requests the agreement of the United States, generally through diplomatic channels, and the United States affirmatively conveys its agreement, generally through diplomatic channels. *See* Warlow Decl. at ¶ 7; Jacobson Decl. at ¶ 5 ("[requests for assurances regarding sentence] are communicated through diplomatic notes from the foreign ministry to our embassies prior to a decision by our treaty partner to extradite a particular fugitive."). Diplomatic custom demands such formality for good reasons: requiring that conditions of extradition be clearly established by diplomatic exchange avoids ambiguity, provides courts with clear evidence of intent, and establishes unambiguous guidelines for countries engaged in negotiation.

For example, in *United States v. Campbell*, 300 F.3d 202 (2d Cir.2002), Costa Rica granted extradition subject to certain enumerated conditions, and, in response, the U.S. Department of State provided assurances to Costa Rica in a diplomatic note and secured an order from the district court providing similar assurances. *Id.* at 206. Similarly, in *United States v. Baez*, 349 F.3d at 90, the Columbian government agreed to extradite the defendant if certain assurances were forthcoming, the United States provided the requested assurances in two diplomatic notes, and only then did the Columbian government extradite the defendant. *Id.* at 92. In the instant case, however, there was no such exchange.

One might speculate that the Dominican authorities, upon being notified that the extradition decree had been signed, transferred Juan and Jose to United States custody without bothering to inquire whether the United States had received the extradition decree, let alone agreed to the condition. Or perhaps they believed the United States was on notice of the provisions of Law number 489 (though, of course, the United States would not be bound by that law). But at no time has the Dominican Republic—though fully informed of thé sentence imposed on Juan—raised the slightest protest. Indeed, subsequent to remand from the Second Circuit, this Court afforded repeated opportunities to the Government of the Dominican Republic to submit papers or appear in person to express its view on this issue; but, tellingly, it chose not to. The Dominican Republic's failure to object calls into question whether it ever intended the language in the decree to give rise to an agreement, and, in any case, suggests that affirming the Court's prior sentence will not offend principles of comity. *See Baez*, 349 F.3d at 92 ("[t]he extradited individual . . . càn only raise those objections to the extradition process that the surrendering country might consider a breach of the extradition treaty.") (internal quotations omitted); *Fiocconi v. Attorney General*, 462 F.2d 475, 481 (2d Cir.1972). Accordingly, Juan's sentence should remain as originally imposed.

As for Jose, his motion, as noted, is principally grounded on his claim that his trial counsel failed to advise him, in advance of his plea, that the extradition decree from the Dominican Republic pur-

**508**

portedly imposed a maximum penalty of thirty years' imprisonment, that the Court also failed to so advise him during his plea colloquy, and that if he had known of this limitation he would not have pleaded guilty regardless of what sentence might be imposed. But since, as determined above, there was no such limitation on either Juan's or Jose's sentence, the argument lacks a factual predicate.

Jose also argues that he would have raised the issue on direct appeal but that his trial counsel, Jorge Guttlein, Esq., failed to perfect that appeal. It is true that Mr. Guttlein, having filed a notice of appeal on Jose's behalf on March 4, 2003, *see* 2d Cir. Docket No. 03–1134, 3/4/03, failed to comply with the Second Circuit's scheduling order of March 17, 2003, *see id.*, 3/17/03, and that the Court of Appeals therefore dismissed the appeal, *see id.*, 8/6/03. It appears that Mr. Guttlein was under the impression that a motion he had filed to be relieved on appeal had been granted before the scheduling order went into effect, whereas in fact his motion to be relieved was not granted until September 19, 2003. *Id.*, 9/19/03. But since the issue Jose claims he would have raised on appeal is the same issue the Court has now determined to be without factual foundation, there is no reasonable probability that, but for counsel's error, the result of the proceeding would have been different, and consequently Jose's motion must be denied. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Accordingly, Jose's motion is denied, Juan's sentence is confirmed, and the Clerk of the Court is directed to close this case in its entirety.

SO ORDERED.