No. 03-1143-cr
United States v. Cuevas

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: May 29, 2007)                                    Decided: July 27, 2007)

Docket No. 03-1143-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOSE CUEVAS, also known as "Chencho," also known as "Checho";
EDWARD VIDAL, also known as "Bomb," also known as "Bam Bam,"
also known as "Rubio," also known as "Americano"; ALCIDES
HERNANDEZ, also known as "Ramon Espinosa," also known as
"Alcides Sabino," also known as "Edmundo Dewindt"; RAMON
Ramirez; Fausto DeJesus; Pablo Sena, Jr., also known as "Elvis";
RAFAEL PAZ; ARELIS VIDAL, also known as "Lourdes Vidal";
RIGOBERTO TAVARES,

*Defendants,*

JUAN CUEVAS, also known as "Juano,"

*Defendant-Appellant.*

_____

B e f o r e :
KEARSE, STRAUB, and POOLER,

*Circuit Judges.*

_____

Appeal from a sentence imposed in the United States District Court for the Southern

District of New York (Jed S. Rakoff, *Judge*), after the defendant was extradited from the

Dominican Republic and pled guilty to conspiracy to distribute and to possess with intent to

distribute five kilograms or more of cocaine, conspiracy to launder money, and money

laundering.

AFFIRMED IN PART, AND REMANDED FOR RECONSIDERATION OF SENTENCE.

_____

B. ALAN SEIDLER, New York, NY, *for Defendant-Appellant.*

DAVID C. ESSEKS, Assistant United States Attorney (Jennifer G. Rodgers, Assistant United States Attorney, *of counsel*; Michael J. Garcia, United States Attorney for the Southern District of New York, *on the brief*), New York, NY, *for Appellee.*
_____

STRAUB, *Circuit Judge*:

Defendant-Appellant Juan Cuevas appeals from a judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) entered March 5, 2003, imposing a sentence under the United States Sentencing Guidelines ("Guidelines") of principally 390 months' imprisonment for conspiring to distribute and to possess with intent to distribute five kilograms or more of cocaine, to run concurrently with lesser sentences on other counts.

This Court first considered Cuevas's appeal in November 2004. At that time, we remanded the case to the District Court to develop a factual record of the circumstances surrounding Cuevas's extradition from the Dominican Republic, and to determine whether the Dominican Republic's decree granting the United States' request for extradition required limitation of Cuevas's sentence to 30 years, *viz.*, 360 months. We deferred ruling on Cuevas's other sentencing objections until the District Court made factual findings on the extradition issue. *See United States v. Cuevas*, 112 Fed. Appx. 806, 807 (2d Cir. 2004).

On remand, the District Court received evidence from the parties relating to Cuevas's extradition, as well as the United States' extradition practices in general. Based on this evidence,

the District Court determined that the Dominican Republic's 30-year sentencing cap did not apply to Cuevas because the United States had never agreed to such a limitation as a condition of his extradition. The District Court therefore confirmed its original sentence of 390 months' imprisonment. *United States v. Cuevas*, 402 F. Supp. 2d 504, 507-08 (S.D.N.Y. 2005).

We find no error in the District Court's factual findings or legal reasoning with respect to extradition, and therefore affirm its decision on that issue. As to the remainder of Cuevas's sentencing objections, we conclude that the District Court did not err in its Guidelines calculations and did not violate Cuevas's constitutional rights by declining to adjourn the sentencing. Nevertheless, because the sentence was imposed prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), we must remand for reconsideration pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).

## BACKGROUND

### A. Indictment and Extradition

On September 29, 1998, Juan Cuevas was indicted, along with nine other defendants, for conspiring to distribute and to possess with intent to distribute five kilograms or more of cocaine from about 1995 through the date of the indictment, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The superseding indictment, filed on April 15, 1999, added two more counts. Count two charged Cuevas and four others with conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1957(a). Count three charged that Cuevas and two others had participated in a money laundering transaction on or about March 19, 1998, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (2).

Several of the defendants named in the indictment were arrested in the spring and summer of 1998. Cuevas, who was living in the Dominican Republic, managed to avoid apprehension at that time. In July 1999, the United States Attorney's Office for the Southern District of New York contacted the Office of International Affairs in the United States Department of Justice ("DOJ") to initiate the process of requesting Cuevas's extradition. The Office of International Affairs, in turn, contacted the United States Department of State ("State Department"), which instructed the U.S. Embassy in Santo Domingo to communicate the request. On August 13, 1999, the U.S. Embassy sent Diplomatic Note No. 116 to the Government of the Dominican Republic, requesting that Cuevas be provisionally arrested in anticipation of extradition to the United States. By Diplomatic Note No. 165, dated November 19, 1999, the U.S. Embassy transmitted to the Government of the Dominican Republic the formal documentation in support of the request for Cuevas's extradition. The extradition request was made pursuant to the Convention for the Mutual Extradition of Fugitives from Justice, U.S.-Dom. Rep., June 19, 1909, 36 Stat. 2468, a bilateral treaty between the United States and the Dominican Republic, and pursuant to the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, art. 6, Dec. 20, 1988, S. Treaty Doc. No. 101-4, 28 I.L.M. 493 (1989) ("U.N. Convention"), a multilateral treaty to which the United States and the Dominican Republic are both signatories. *See Cuevas*, 402 F. Supp. 2d at 505-06.

By Diplomatic Note DEI-99-1349, dated November 29, 1999, the Government of the Dominican Republic acknowledged receipt of the extradition request. After some delay, on July 6, 2002, the Dominican Republic transferred custody over Cuevas to the United States, and Cuevas was subsequently transported to New York. In late July, two weeks after Cuevas's

4

return, the United States received a copy of a decree, signed by the President of the Dominican Republic, authorizing Cuevas's extradition. *Id.* at 506. The decree, dated July 2, 2002, stated in pertinent part: "[I]t is understood that the above-named [defendant] [is] covered by the provisions of Article 4, Paragraph II of Law number 489, dated October 22, 1969, as amended by Law number 278-98 on July 29, 1998." Dom. Rep. Extradition Decree 495-02, July 2, 2002. The referenced provision of the Dominican Republic's Law No. 489 reads: "In extradition treaties signed by the Dominican State with other States, when the extradition of a national is granted, no penalty greater than the maximum established in this country, which at the moment this law enters into force is thirty years, shall be imposed." Dom. Rep. Law No. 489 on Extradition, art. 4, para. II (1969), as amended by Dom. Rep. Law No. 278-98 (1998).

**B.      Plea and Sentencing**

On October 4, 2002, Cuevas appeared with counsel before the U.S. District Court for the Southern District of New York and pled guilty to all three counts of the superseding indictment. After conducting a thorough plea allocution, the District Court accepted Cuevas's guilty plea on all counts.

During the course of the hearing, the Assistant U.S. Attorney ("AUSA") notified the District Court that another indictment, charging a closely-intertwined conspiracy, was pending against Cuevas in the United States District Court for the Southern District of Florida. The AUSA stated that her office was willing to accept a transfer pursuant to Rule 20 of the Federal Rules of Criminal Procedure and had so advised the United States Attorney's Office in the Southern District of Florida, but that she had been unable to finalize the arrangement. The AUSA further represented that in the event that the transfer request was declined, her office

5

would continue to take the position that the sentences in the two cases should be imposed concurrently. Cuevas stated that he understood the situation and acknowledged that there was no guarantee that the transfer would be completed before sentencing, which the District Court scheduled for the following February. The District Court set a *Fatico* hearing for the week prior to sentencing to resolve the parties' disputes over the applicability of certain sentencing enhancements. *See generally United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).

The *Fatico* hearing was held on February 11 and 14, 2003. The government called two witnesses, both of whom had been charged as co-conspirators in the drug distribution scheme and who had entered into cooperation agreements with the government. The first witness, Edward Vidal, testified about the inner workings of the organization from his vantage point as a pickup/delivery man for Cuevas. The second witness, Rafael Duverge, testified about his business dealings with Cuevas in the drug importation business from 1995 to September 1998. Counsel for Cuevas was given an opportunity to cross-examine both witnesses. Cuevas himself did not testify or present any witnesses at the *Fatico* hearing.

On February 21, 2003, the District Court issued an order finding, by a preponderance of the evidence, that "(1) the conspiracy of which [Cuevas] was a member distributed, as he well knew, in excess of 150 kilos of cocaine, (2) a firearm, as he well knew, was used in the conspiracy, and (3) he was a leader of the conspiracy." The District Court scheduled a hearing for February 24, 2003 to hear argument on: the government's request that Cuevas not receive any reduction for acceptance of responsibility; and on Cuevas's requests for downward departures based on his family ties and obligations, his physical disabilities, and a combination of those circumstances.

At the February 24th hearing, Cuevas's counsel sought an adjournment of sentencing until the transfer of the indictment pending in the Southern District of Florida could be finalized. The District Court denied the application stating that "this long-delayed sentence should [not] be delayed any further," but noted that it was "strongly predisposed to impose a concurrent sentence on any Rule 20 sentence that might eventuate." After hearing argument from both sides on the sentencing issues, the District Court granted Cuevas a two-point decrease for acceptance of responsibility, but declined to depart downward based on Cuevas's family and medical circumstances. Applying the Guidelines, the District Court determined that, based on an offense level of 38 for a quantity of over 150 kilograms of cocaine, a four-point enhancement for the leadership role, a two-level enhancement for the firearm, and a two-level reduction for acceptance of responsibility, the total offense level was 42, yielding a Guidelines range of 360 months to life imprisonment. The District Court ultimately sentenced Cuevas to 390 months' imprisonment on count one, to run concurrently with 240 months' imprisonment on counts two and three, as well as a five-year term of supervised release and a mandatory special assessment of $300.

### C.    Initial Appeal

Cuevas timely appealed his sentence. In his initial appellate brief, filed on June 14, 2004, Cuevas argued that his guilty plea was involuntary and his sentence illegal because he was not informed of, nor sentenced in compliance with, the maximum penalty of 30 years' imprisonment as set forth in the decree granting his extradition from the Dominican Republic. Cuevas also argued that the District Court had erred in its application of the Guidelines, specifically, in determining the quantity of drugs, in assessing the leadership enhancement, and in denying his

7

downward departure motions. Finally, Cuevas contended that the District Court had violated his due process rights by refusing to adjourn the sentencing pending completion of the Rule 20 transfer.

On July 20, 2004, Cuevas filed a supplemental brief, raising the additional argument that under the Supreme Court's June 24, 2004 decision in *Blakely v. Washington*, 542 U.S. 296 (2004), the District Court's "ad hoc findings" concerning his relevant conduct, role in the offense, and possession of a weapon were unconstitutional judicial determinations.

On November 23, 2004, following oral argument, this Court issued a decision remanding the case on the extradition issue. We concluded that there was insufficient evidence to permit meaningful review of that issue, since the record lacked any indication as to "whether the United States and the Dominican Republic reached an agreement as to the sentence that could be imposed upon Cuevas." *Cuevas*, 112 Fed. Appx. at 807. We therefore directed the District Court, on remand, "to conduct an evidentiary hearing on the issue, make factual findings, and, if necessary, reconsider its prior rulings and modify the judgment." *Id*. We deferred decision on the remaining sentencing matters until such time that the District Court confirmed or modified its sentence in light of its findings on the extradition issue.

**D.     Proceedings on Remand**

Pursuant to our order, the District Court conducted several hearings and received written submissions from the parties on the matter of extradition. In support of its position, the government submitted declarations from the Director of the Office of International Affairs and the State Department's Assistant Legal Advisor for Law Enforcement and Intelligence, who explained that typically, when a foreign country seeks to impose a sentencing limitation as a

8

condition of granting extradition, it requests formal assurances from the United States prior to surrendering the defendant. The declarants further attested that between November 1999, when the Dominican Republic acknowledged receipt of the extradition request, and July 6, 2002, when the Dominican Republic relinquished custody over Cuevas, the United States did not receive any diplomatic communications from the Dominican Republic regarding Cuevas's extradition.

These undisputed facts formed the basis of the District Court's December 12, 2005 decision. The District Court found that the United States had never expressly agreed to the limitation of Cuevas's sentence as a condition of extradition either prior to, or at the time of, the transfer of custody. The fact that the extradition decree contained such a condition was irrelevant, since the United States could not have "agreed to be bound by a condition it only learned of after taking custody." *Cuevas*, 402 F. Supp. 2d at 507. The District Court also noted that the Dominican Republic, though fully informed of the sentence imposed on Cuevas, had not "raised the slightest protest." *Id.* Based on these findings, the District Court concluded that Cuevas's "sentence should remain as originally imposed." *Id.*

Cuevas thereafter reinstated his appeal before this Court.

**DISCUSSION**

**A.      Effect of Extradition Decree and Treaties on Cuevas's Sentence**

As a preliminary matter, the government contends that in the absence of protest from the Dominican Republic, Cuevas lacks standing to raise violation of an extradition treaty as an issue. This Court has not conclusively decided whether a defendant has standing to challenge his sentence on the ground that it violates the terms of the treaty or decree authorizing his

9

extradition. *See United States v. Banks*, 464 F.3d 184, 191 (2d Cir. 2006). We need not resolve this issue here, however, because Cuevas's arguments plainly fail on the merits. *See id.*

The rule of specialty, which is derived from principles of international comity, "generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country." *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003) (per curiam). Typically, the rule of specialty is invoked to circumscribe the specific crimes for which a defendant may be tried following extradition. *See United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002) ("It is well established that, under the international principle of specialty, an extradited defendant may not be tried for a crime not enumerated in the applicable extradition treaty." (citing *United States v. Rauscher*, 119 U.S. 407, 424 (1886); *United States v. Flores*, 538 F.2d 939, 944 (2d Cir. 1976))). However, the rule of specialty has application in the sentencing context as well. As we held in *United States v. Baez*, since "the cauldron of circumstances in which extradition agreements are born implicate the foreign relations of the United States," a district court, "[i]n sentencing a defendant extradited to this country in accordance with a diplomatic agreement between the Executive branch and the extraditing nation, . . . delicately must balance its discretionary sentencing decision with the principles of international comity in which the rule of specialty sounds." 349 F.3d at 93. In more concrete terms, this means that a district court "should temper [its] discretion in sentencing an extradited defendant *with deference to the substantive assurances made by the United States to an extraditing nation*." *Id*. (emphasis added).

The District Court did not offend against the rule of specialty here. The 1909 extradition treaty between the United States and the Dominican Republic contains no limitations on

sentencing. *See Banks*, 464 F.3d at 187, 191. Furthermore, the factual record developed on remand establishes that the United States never made any substantive assurances to the Dominican Republic that if extradited and convicted, Cuevas would not be sentenced to a term of more than 30 years' imprisonment. *Cf. Baez*, 349 F.3d at 92 (observing that prior to the extradition, the United States had sent a diplomatic note, "assuring Colombia that should Mr. Restrepo be convicted of the offenses for which extradition has been granted, the United States executive authority, with the agreement of the attorney for the accused, will not seek a penalty of life imprisonment at the sentencing proceedings in this case"); *Campbell*, 300 F.3d at 206 (recounting that the U.S. Department of State had "provided assurances to the Costa Rican government in a diplomatic note . . . stating, *inter alia*, that 'Campbell will not be sentenced to serve a term of imprisonment greater than 50 years'"). While the extradition decree indicates that "officials of the Dominican Republic believed, no doubt based on the domestic law of the Dominican Republic, that [Cuevas's] sentence would be so limited," critically, nothing in the decree "point[s] to any agreement or undertaking made by the United States to limit his sentence." *Banks*, 464 F.3d at 191-92. The Dominican Republic's unilateral belief that Cuevas would be covered by Law No. 489 is insufficient to bind the United States. *See id.* at 192.

Cuevas does not dispute the District Court's finding that the United States provided no diplomatic assurances regarding the limitation of his sentence as part of the extradition arrangement. Cuevas contends that the United States is bound by the 30-year sentencing limitation, notwithstanding the absence of specific assurances, because in signing the U.N. Convention, "the United States agreed it is the law of the Dominican Republic that controls the conditions upon which extradition is made." Cuevas rests his argument on the language of

11

Article 6, paragraph 5 of the U.N. Convention, which provides: "Extradition shall be subject to the conditions provided for by the law of the requested Party or by applicable extradition treaties, including the grounds upon which the requested party may refuse extradition."  U.N. Convention, art. 6, para. 5, 28 I.L.M. at 507.

In interpreting a treaty, we must "begin with the text of the treaty and the context in which the written words are used."  *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 534 (1987) (internal quotation marks omitted).  When Article 6 is read as a whole, it becomes clear that paragraph 5 simply means that a State may consider conditions in its domestic laws or applicable extradition treaties in deciding whether to grant a request made pursuant to the U.N. Convention, and may refuse to extradite unless the requesting State agrees to comply with those conditions.  Accordingly, paragraph 6 of Article 6 states: "*In considering requests received pursuant to this article, the requested State may refuse to comply with such requests* where there are substantial grounds leading its judicial or other competent authorities to believe that compliance would facilitate the prosecution or punishment of any person on account of his race, religion, nationality or political opinions, or would cause prejudice for any of those reasons to any person affected by the request."  U.N. Convention, art. 6, para. 6, 28 I.L.M. at 507 (emphasis added).  The onus is on the requested State to determine, prior to surrendering the individual, whether extradition is permitted under its own laws and treaty obligations.  Thus, paragraph 8 provides: "*Subject to the provisions of its domestic law and its extradition treaties, the requested Party may, upon being satisfied that the circumstances so warrant* and are urgent, and at the request of the requesting Party, take a person whose extradition is sought and who is present in its territory into custody or take other

12

appropriate measures to ensure his presence at extradition proceedings." *Id.*, art. 6, para. 8, 28 I.L.M. at 507 (emphasis added).

Here, the Dominican Republic did not make adherence to Law No. 489 a mandatory condition of extradition; indeed, the issue of sentencing was never discussed at any point prior to the transfer of custody. Nothing in Article 6, including paragraph 5, makes the domestic laws of the Dominican Republic binding on the United States in this situation. *Cf. Rosado v. Civiletti*, 621 F.2d 1179, 1192 (2d Cir. 1980) (opining that "no nation may unilaterally bind another sovereign by the sheer force of its statutory enactments").

Our reading finds further support in the normal practices of the United States and its extradition treaty partners, including the Dominican Republic. *See Société Nationale*, 482 U.S. at 534 (stating that "the practical construction adopted by the parties may also be relevant" in interpreting a treaty (internal quotation marks omitted)). As the declarations from the Director of the Office of International Affairs and the Assistant Legal Advisor for the State Department establish, when a foreign nation seeks to impose a limitation on a sentence as a condition of granting the extradition of a defendant to the United States, it formally requests assurances from the United States by way of diplomatic note. The DOJ, in consultation with the State Department, determines whether the United States can and should provide the requested assurances, and relays the official position by diplomatic note. The foreign nation then considers the response of the United States in deciding whether to extradite the defendant.

In this case, the Dominican Republic did not request or secure any assurances regarding the limitation of Cuevas's sentence before surrendering him to the United States. Because the United States never agreed that Cuevas's extradition would be subject to Law No. 489, the

13

District Court was under no obligation to limit Cuevas's sentence to 30 years. We therefore affirm the District Court's conclusion that Cuevas's sentence of 390 months' imprisonment is not illegal, and that his guilty plea was not involuntary or uninformed.

**B.      Cuevas's Sixth Amendment and Guidelines-Related Objections**

In his initial appeal, Cuevas raised several Guidelines-related objections to his sentence. In his original brief, Cuevas challenged the District Court's offense level determinations, specifically its underlying findings as to drug quantity and his role in the organization, as clearly erroneous in light of the record developed at the *Fatico* hearing. Cuevas also argued that the District Court had committed error in denying his motion for a departure based on extraordinary family and medical circumstances. In his supplemental brief, filed a month after the Supreme Court handed down its decision in *Blakely v. Washington*, 542 U.S. 296 (2004), Cuevas advanced the alternative position that the District Court should not have relied on its own findings at all, at least not to enhance the sentence.

Since the time of the first appeal, the law governing federal sentencing has changed significantly. Six months after *Blakely*, the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005). In *Booker*, the Court clarified that to comply with the Sixth Amendment, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the [statutory] maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 244 (Stevens, *J.*, opinion for the Court). To implement this holding, the Supreme Court excised the provision of the Guidelines that made its application mandatory. *See id.* at 245 (Breyer, *J.*, opinion for the Court).

14

Although "*Booker* removed the mandatory teeth of the . . . Guidelines . . . by rendering them advisory," it did not discard the Guidelines altogether. *United States v. Cavera*, __F.3d__, 2007 WL 1628799, at \*1 (2d Cir. June 6, 2007). While a district court is no longer required to impose a Guidelines sentence, it still has a duty to consider the applicable Guidelines range, in addition to the other factors listed in 18 U.S.C. § 3553(a), in determining the appropriate sentence. *See Crosby*, 397 F.3d at 111-12. Furthermore, under the post-*Booker* regime, the sentencing judge is "entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112. In short, "district courts remain statutorily obliged to calculate Guidelines ranges in the same manner as before *Booker* and to find facts relevant to sentencing by a preponderance of the evidence." *United States v. Vaughn*, 430 F.3d 518, 526-27 (2d Cir. 2005), *cert. denied*, 547 U.S. 1060 (2006); *see also, e.g.*, *United States v. Salazar*, __F.3d__, 2007 WL 1704095, at \*2-3 (2d Cir. June 13, 2007).

Cuevas pled guilty to a conspiracy involving more than five kilograms of cocaine, which carries a maximum sentence of life imprisonment, 21 U.S.C. § 841(b)(1)(A), and to money laundering and conspiracy to launder money, each of which carries a maximum sentence of 20 years' imprisonment, 18 U.S.C. § 1956(a)(1). Because the sentence imposed did not exceed these statutory maximums, the District Court did not violate Cuevas's Sixth Amendment rights by relying on its own factual findings in determining the appropriate Guidelines range. *See United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 600 (2007); *see also United States v. Ubiera*, 486 F.3d 71, 77 (2d Cir. 2007) ("*Booker* does require factfinding by a jury and beyond a reasonable doubt, but only where the fact 'is necessary to

15

support a sentence exceeding the maximum authorized by the facts established by a plea of guilty.'" (quoting *Booker*, 543 U.S. at 244)), *petition for cert. filed* (U.S. June 9, 2007) (No. 06-11887).

Because the District Court sentenced Cuevas prior to *Booker*, however, it understandably but erroneously treated the Guidelines as mandatory. In *United States v. Crosby*, this Circuit's first decision applying *Booker*, we held that where a defendant raises a Sixth Amendment challenge to his sentence on appeal that he did not preserve below, *Booker* requires that we remand the case for the district court to consider whether it would have imposed a nontrivially different sentence had it appreciated that the Guidelines were advisory and considered all of the factors listed under 18 U.S.C. § 3553(a). *See Crosby*, 397 F.3d at 119-20. The purpose of a *Crosby* remand is to ascertain whether the district court's pre-*Booker* mandatory application of the Guidelines was plain error. The plain error analysis is satisfied if, on remand, the district judge determines "that the original sentence would have differed in a nontrivial manner from that imposed." *Id.* at 118. If, on the other hand, the district judge decides, "in full compliance with now applicable requirements, that under the post-*Booker* . . . regime the sentence would have been essentially the same as originally imposed," any Sixth Amendment error is harmless. *Id.*

While the government acknowledges that Cuevas's original sentence predates *Booker*, it contends that a *Crosby* remand is unnecessary for two reasons – first, because the District Court chose a sentence at the bottom of the applicable Guidelines range and expressed its views on the appropriateness of the Guidelines sentence at the original sentencing; and second, because the District Court concluded on remand, after *Booker* and *Crosby*, that Cuevas's "sentence should remain as originally imposed." *Cuevas*, 402 F. Supp. 2d at 507. Neither rationale is persuasive.

16

First, as we recognized in *Crosby*, while it may be possible for this Court to "make an educated guess as to the likely outcome of a remand," it is still prudent to remand because "that guess might be wrong, absent a clear indication at the original sentencing supporting the inference that the same sentence would have been imposed under the post-*Booker* . . . regime." *Crosby*, 397 F.3d at 118. No such "clear indication" exists here: Although the District Court noted that it was not "uncomfortable with how high the [G]uidelines" sentence was in Cuevas's particular case, we cannot say with certainty that the District Court would not have imposed a non-Guidelines sentence had it perceived this to be a possibility. Second, while the District Court stated in its December 2005 decision that Cuevas's "sentence should remain as originally imposed," the body of the decision makes plain that the only matter considered by the District Court on remand was the extradition issue. *Cuevas*, 402 F. Supp. 2d at 507; *see also id.* ("The Dominican Republic's failure to object calls into question whether it ever intended the language in the decree to give rise to an agreement, and, in any case, suggests that affirming the Court's prior sentence will not offend principles of comity. Accordingly, Juan's sentence should remain as originally imposed." (citations omitted)). At oral argument, the government conceded that there was no mention of *Booker* at any point during the remand proceedings. We therefore conclude that a *Crosby* remand is necessary.

Because the District Court has not yet had the opportunity to reconsider its sentence in light of *Booker*, "our present task is not to review [Cuevas's] sentence[] for reasonableness," the new standard established by *Booker*. *United States v. Garcia*, 413 F.3d 201, 222 (2d Cir. 2005). We consider Cuevas's objections to the District Court's Guidelines calculations, however, because "the district court, on remand, remains under an obligation to consider the Guidelines,

17

and our resolution of [a] defendant['s] Guidelines objections 'will assist the district court in fulfilling that obligation.'" *Id.* (quoting *United States v. Maloney*, 406 F.3d 149, 152 (2d Cir. 2005)); *see also United States v. Carr*, 424 F.3d 213, 230 (2d Cir. 2005) (considering the defendant's objection to the district court's previous application of the Sentencing Guidelines before remanding, and explaining that "[t]his is a question the district court will again be required to decide on remand because, post-*Booker*, it must still consider the appropriate Guidelines sentence along with the other section 3553(a) factors in arriving at the correct sentence"), *cert. denied*, 546 U.S. 1221 (2006).

Cuevas contends that there was insufficient evidence for the District Court to find that the conspiracy involved more than 150 kilograms of cocaine, or that he played a leadership role in criminal activity involving five or more participants, *see* U.S.S.G. § 3B1.1(a). "In reviewing a district court's sentencing decision on appeal, this Court 'accept[s] the findings of fact of the district court unless they are clearly erroneous. . . .'" *United States v. Franklyn*, 157 F.3d 90, 97 (2d Cir. 1998); *see United States v. Gotti*, 459 F.3d 296, 349 (2d Cir. 2006) (stating that the clear error standard is appropriate where the district court's application of a sentencing guideline in a particular case "presents an issue that is predominantly factual rather than legal"), *cert. denied*, 75 U.S.L.W. 3694 (June 25, 2007). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Hazut*, 140 F.3d 187, 190 (2d Cir. 1998) (internal quotation marks omitted). Factual findings based on the testimony and observation of witnesses are entitled to "particular deference," *United States v. Morrison*, 153 F.3d 34, 52 (2d Cir. 1998), since "assessing the credibility of witnesses is distinctly the province

18

of the district court," *United States v. Beverly*, 5 F.3d 633, 642 (2d Cir. 1993).

Our examination of the record leaves us with a firm conviction that no error was committed here. At the *Fatico* hearing, Edward Vidal named more than five people who worked for Cuevas. He testified that between 1996 and 1997 alone, the organization arranged for more than 250 kilograms of cocaine to be shipped from Miami to New York. Vidal's job was to distribute the cocaine to customers in New York; when asked who provided the delivery instructions, Vidal stated that Cuevas told him how many kilos to deliver to each customer. Vidal further testified that between the end of 1997 and the time of his arrest in 1998, he picked up five or six shipments of cocaine, totaling more than 1300 kilograms. Vidal stated that he attended some meetings at which the final large shipment of cocaine was discussed, but that Cuevas was the one who actually negotiated the deal with the supplier. Although Vidal was not paid much for his work, at least not in cash, he testified that the one cash payment he did receive came from Cuevas.

Rafael Duverge testified that he and Cuevas were partners in the drug importation business, although they ran separate organizations. Duverge stated that during the length of their partnership from 1995 to September 1998, Cuevas received approximately 1000 kilograms of cocaine from the supplier. Duverge also confirmed that Cuevas was the "boss" of his organization, which had multiple employees. Duverge described conversations that he had with Cuevas regarding the security of the locations where Cuevas stored the drug proceeds, and noted that on one occasion, Cuevas "had money moved from one place to another" to avoid apprehension. The above testimony, which the District Court found credible, provided more than enough evidence to support its findings that the conspiracy involved the distribution of more than

19

150 kilograms of cocaine, *see* U.S.S.G. § 1B1.3(a)(1)(A), (B), and that Cuevas was a leader of the conspiracy, which involved five or more participants, *see United States v. Valdez*, 16 F.3d 1324, 1335 (2d Cir. 1994); *see also* U.S.S.G. § 3B1.1, cmt. n.4.

Cuevas also argues that the District Court erred in rejecting his application for downward departures on the bases of his family and medical circumstances. This argument is without merit. "As was true when the Guidelines were mandatory, we have held in the post-*Booker* sentencing regime that 'a refusal to downwardly depart is generally not appealable,' and that review of such a denial will be available only 'when a sentencing court misapprehended the scope of its authority to depart or the sentence was otherwise illegal.'" *United States v. Stinson*, 465 F.3d 113, 114 (2d Cir. 2006) (quoting *United States v. Valdez*, 426 F.3d 178, 184 (2d Cir. 2005); citing *United States v. Gonzalez*, 281 F.3d 38, 42 (2d Cir. 2002) (stating pre-*Booker* rule)). The District Court here clearly understood that it had the authority to grant the requested departures, but decided not to depart in consideration of the particular circumstances of Cuevas's case.

Finally, Cuevas contends that the District Court unconstitutionally prevented him from testifying in his own defense by refusing to adjourn the sentencing until the related indictment pending in the Southern District of Florida could be transferred, so that he might enter a guilty plea in that matter. We are unpersuaded by this argument: Cuevas was afforded the opportunity to testify on his behalf at the sentencing hearing, but "after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts," he opted not to do so. *Brown v. United States*, 356 U.S. 148, 155 (1958). We find no constitutional error in the District Court's decision not to adjourn the proceedings. *Cf. United States v. Maurer*, 226 F.3d 150, 151 (2d Cir. 2000) (per curiam) ("The procedures used at

20

sentencing are within the discretion of the district court so long as the defendant is given an adequate opportunity to present his position as to matters in dispute.").

**CONCLUSION**

For the foregoing reasons, the District Court's judgment is AFFIRMED with respect to the extradition issue and the Guidelines calculations. We REMAND the case to the District Court for reconsideration of its sentence in light of *United States v. Booker*, 543 U.S. 220, and *United States v. Crosby*, 397 F.3d 103, and consistent with this opinion. Any appeal taken from the District Court's decision on remand can be initiated only by filing a new notice of appeal. *See* Fed. R. App. P. 3, 4(b).