*United States v. Bullock*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2024

(Argued: November 21, 2024          Decided: August 22, 2025)

No. 23-7341

_____

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

RANDOLPH BULLOCK,

*Defendant-Appellant.*

_____

Before:      LIVINGSTON, Chief Judge, JACOBS, and MENASHI, Circuit Judges.

Defendant-Appellant Randolph Bullock ("Bullock") appeals from a judgment of the United States District Court for the Northern District of New York (Suddaby, *J.*) convicting him, following his guilty plea, of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  On appeal, Bullock argues that the district court erred in calculating his offense level by applying a five-level enhancement for "engag[ing] in a pattern of activity involving the sexual abuse or exploitation of a minor."  U.S.S.G. § 2G2.2(b)(5).  Section 2G2.2(b)(5)'s pattern of abuse enhancement applies if a defendant has engaged in "any combination of

1

two or more *separate instances* of the sexual abuse or sexual exploitation of a minor." U.S.S.G. § 2G2.2 cmt. n.1 (emphasis added). The district court found by a preponderance of the evidence that on September 14, 2014, Bullock abused two children at his church. The two acts of abuse were separated by non-criminal conduct and occurred in different rooms of the building. Bullock contends that the district court erred in applying the pattern enhancement on these facts because his offenses that day constitute only a single "instance" of sexual abuse. We disagree. Relying by analogy on the Supreme Court's analysis in *Wooden v. United States*, 595 U.S. 360 (2022), we conclude that Bullock's acts constitute two separate instances of sexual abuse and that the district court therefore did not err in applying the § 2G2.2(b)(5) pattern of abuse enhancement.

Bullock also challenges the substantive reasonableness of his 97-month sentence and the procedural reasonableness of special conditions of supervised release restricting his contact with minors, limiting him to a single internet-capable device, and prohibiting him from viewing or possessing sexually explicit material. We hold that Bullock's sentence is not substantively unreasonable and that the district court did not err in imposing the challenged special conditions.

Accordingly, the judgment of the district court is **AFFIRMED.**

FOR APPELLEE:                    Joshua Rothenberg, Assistant United States Attorney, *for* Carla B. Freedman, United States Attorney for the Northern District of New York, Syracuse, NY.

FOR DEFENDANT-APPELLANT:          Paul James Angioletti, Staten Island, NY.

DEBRA ANN LIVINGSTON, *Chief Judge*:

Defendant-Appellant Randolph Bullock ("Bullock") appeals from a judgment of the United States District Court for the Northern District of New York (Suddaby, *J.*), entered on September 28, 2023, convicting him, following his guilty

2

plea, of three counts of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). The district court sentenced Bullock principally to 97 months' imprisonment to be followed by a 20-year term of supervised release.

On appeal, Bullock argues that the district court erred by applying a five-level enhancement to his offense level pursuant to U.S.S.G. § 2G2.2(b)(5), which applies when a defendant has "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." Bullock, who molested two boys after church services in 2014, contends that his actions do not constitute a pattern because he did not engage in "two or more *separate instances* of . . . sexual abuse." U.S.S.G. § 2G2.2 cmt n.1. According to Bullock, he abused his two victims during a single instance, and thus the pattern enhancement should not apply. Bullock also contends that his sentence was substantively unreasonable and that the district court procedurally erred when imposing special conditions of supervised release restricting his contact with minors, limiting him to a single internet-capable device, and prohibiting him from viewing or possessing any material depicting sexually explicit conduct.

We disagree. We first conclude that the district court appropriately applied § 2G2.2(b)(5)'s pattern enhancement. In considering what constitutes an instance

of sexual abuse, we find instructive the Supreme Court's analysis in *Wooden v. United States*, 595 U.S. 360 (2022). In determining whether criminal acts occurred on separate occasions for the purposes of 18 U.S.C. § 924(e)(1), *Wooden* considered: (1) whether the offenses were "committed close in time, in an uninterrupted course of conduct," (2) whether the offenses occurred in close geographic "[p]roximity," and (3) the degree to which "the conduct giving rise to the offenses" was "similar or intertwined" such that it indicated "a common scheme or purpose." *Id.* at 369. Here, Bullock molested a six-year-old boy in the pastor's office of his church after services on September 14, 2014. Later that day, after counting the donations the church had received, Bullock molested a four-year-old boy in a church classroom. The district court found that Bullock acted opportunistically in sexually abusing the two victims, in different places and at different times separated by intervening non-criminal conduct. By analogy to *Wooden*, this cannot reasonably be deemed a single instance of criminal conduct.

We also conclude that Bullock's sentence is not substantively unreasonable, that the district court sufficiently justified the imposition of the challenged special conditions, and that those special conditions are amply supported by the record.

We therefore **AFFIRM** the judgment of the district court.

4

## BACKGROUND

Bullock began looking at inappropriate images of children in the 1980s and continued to do so, at least intermittently, for the ensuing three decades. The investigation leading to Bullock's instant conviction began when Bullock's coworkers reported him for viewing what appeared to be child pornography at work in 2018. A forensic analysis of Bullock's work devices proved the accusations credible, and Bullock was fired. Bullock then self-referred to a 75-day residential treatment program designed to help people with sexual compulsions, and he continued to receive outpatient services after its completion. The treatment proved unsuccessful. Bullock—who was by this point under investigation for suspected possession of child pornography—was seen publicly viewing inappropriate images of children on a public library computer in November 2018 and again in April 2021. A subsequent search of Bullock's personal computers revealed that he possessed between 10 and 150 images of child pornography as well as a large number of images indicating a sexual interest in children but not strictly meeting the definition of child pornography.

On June 17, 2022, a grand jury charged Bullock with three counts of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Bullock pleaded guilty to all three counts pursuant to a plea agreement. In the plea

agreement, the parties stipulated to a variety of Guidelines provisions but noted a dispute over the applicability of U.S.S.G. § 2G2.2(b)(5), which provides for a five-level enhancement where a defendant "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor."

The dispute over the pattern enhancement relates to Bullock's abuse of two young boys, then aged four and six, in 2014. At the time, Bullock was serving as treasurer and deacon of a church where the two victims were often present. After services on September 14, 2014, Bullock took the six-year-old victim ("Victim 1") into the pastor's office.[1] Bullock reached into Victim 1's pants, fondled his penis, and refused to stop despite Victim 1's protest.

Thereafter, Bullock went to a classroom in the church so that he and the church's assistant treasurer could count the donations received that day. After counting the money, the assistant treasurer left the classroom. The four-year-old

---

[1] The exact date of Victim 1's abuse is in dispute. Victim 1 alleges that Bullock groped his penis after services on September 14, 2014. At Bullock's sentencing hearing, Victim 1's father suggested Victim 1's abuse occurred one week prior. For his part, Bullock denies touching Victim 1 on September 14, 2014, but admits that he may have done so at some point. The district court did not specifically address this discrepancy but stated that it was "adopt[ing] the factual information . . . contained in the Presentence Investigation Report." App'x 163. Because the Presentence Investigation Report ("PSR") states clearly that both victims were abused on September 14, 2014 and this timeline is most favorable to Bullock, we proceed on this version of events.

6

victim ("Victim 2") then wandered in.[2]  Bullock placed his hand inside of Victim

2's pants and touched his penis.  When Victim 2 ran out of the classroom, he was

heard to shout, "he touched my pee-pee."  PSR ¶ 24.

When interviewed by police, Bullock admitted that he touched Victim 2's

penis and said that he may have also touched Victim 1's penis but did not

remember doing so.  Bullock claimed, however, that any touching was done

inadvertently while trying to tuck in the boys' shirts and was not done for sexual

gratification.  Contrary to Bullock's claim, Victim 2's mother told officers that her

son was not wearing a shirt that was meant to be tucked in and that her son's shirt

was not tucked in when he came out of the classroom where the abuse took place.

Although state authorities decided not to prosecute Bullock, federal investigators

became aware of the abuse during their investigation into Bullock's possession of

child pornography.

The Probation Office included Bullock's abuse of both Victims 1 and 2 in the

Presentence Investigation Report ("PSR") and referenced the abuse as a basis for

applying the § 2G2.2(b)(5) enhancement.  Bullock argued in his sentencing

---

[2] The record is unclear exactly as to where the abuse of Victim 2 took place.  Bullock claims that Victim 2 came into the same room where he had counted the money, but a witness told officers that Victim 2 was in a classroom adjoining the room where Bullock had been counting money and that Bullock followed him into that room.  The record is clear, however, that Bullock abused Victims 1 and 2 in different parts of the church.

memorandum that there was insufficient proof he abused both boys. For its part, the government argued that it had met its burden, noting that the children had promptly come forward with detailed reports of abuse, that witnesses had corroborated the victims' recitation of events, that Bullock had admitted to touching at least one victim, and that Bullock had an acknowledged and documented sexual interest in children of the victims' ages.

On September 27, 2023, Bullock appeared before the district court for sentencing. The district court adopted the five-level pattern of abuse enhancement over Bullock's objection. The district court stated that Bullock's contention that he did not touch the victims for sexual gratification but rather did so accidently while tucking in their shirts was a "convenient and preposterous claim." App'x 112. The district court emphasized the spontaneity of the victims' outcry, Bullock's demonstrated sexual interest in male children of the victims' ages, and Bullock's admission to touching Victim 2's penis. Based on these considerations, the district court determined that "more than a preponderance" of the evidence justified the enhancement. *Id*.

After the district court heard from defense counsel and the government on sentencing and the relatives of Victim 1 and Victim 2 on the harm caused by

8

Bullock's actions, Bullock exercised his right to address the court. He expressed remorse for "actions [he] may have taken back in 2014" and more generally for "offenses [he] ha[d] caused to various people directly and to society in general." *Id.* at 158, 160. Bullock emphasized that he had "never been accused of mistouching, mishandling anyone, although [he'd] had many opportunities to do so over [his] lifetime." *Id.* at 158. As to the child pornography he possessed, Bullock told the court that he intended to view only legal images of nude children and that the images meeting the definition of child pornography were "found somehow." *Id.* at 159. He explained that he sought treatment after being fired from his job but ultimately relapsed "because [he] was not under the duress of the threat of prosecution." *Id.* at 160. The district court criticized Bullock's allocution as reflecting a failure to accept full responsibility for the harm his offenses had caused. The district court also explained that it viewed Bullock as particularly dangerous because he had recognized his problematic attraction to children, underwent treatment, and yet continued to seek out child pornography.

The district court adopted the factual information and Guidelines calculation in the PSR—including the five-level pattern of abuse enhancement. Based on a Guidelines imprisonment range of 97 to 121 months, the district court

sentenced Bullock to a 97-month term of imprisonment and imposed a 20-year term of supervised release. The district court also imposed the special conditions of supervised release that were recommended in the PSR, four of which are relevant to Bullock's appeal, and to which Bullock raised no objection.[3]

Special Condition One prohibits Bullock from having "direct contact with any child [he] know[s] or reasonably should know to be under the age of 18 without the permission of the probation officer" and requires him to report any such contact within 24 hours. *Id.* at 17. Special Condition Two prohibits Bullock from going to or remaining at "any place where [he] know[s] children under the age of 18 are likely to congregate, including parks, schools, playgrounds, and childcare facilities without the permission of the probation officer." *Id.* The district court explained that these conditions limiting Bullock's interaction with minors were "not only related to [Bullock's] history and characteristics, but [were also] necessary to promote [Bullock's] rehabilitation and protect the public." *Id.* at 165.

---

[3] The district court also included fifteen "standard conditions" of supervised release in the written judgment. App'x 16. The PSR did not list these conditions, but the standard conditions in the written judgment reflect the fifteen conditions deemed "standard" by a general order in effect in the Northern District of New York at the time of Bullock's sentencing. The district court announced at sentencing that Bullock was required to "comply with the standard conditions that have been adopted by this Court." *Id.* at 164. Bullock does not challenge those conditions on appeal.

Special Condition Five provides that, "[u]nless otherwise approved by the Court, [Bullock] must be limited to possessing one personal internet-capable device to facilitate the U.S. Probation Office's ability to effectively monitor [his] internet related activities." *Id.* at 17. The district court explained that this condition, too, was necessary to promote Bullock's rehabilitation and to protect the public and was further "justified based upon [Bullock's] possession of numerous devices, including computers and thumb drives that [he] used to commit the instant offense." *Id.* at 165–66.

Special Condition Seven requires that Bullock "not view, possess, own, subscribe to or purchase any material . . . that depict[s] sexually explicit conduct." *Id.* at 17. In addition to promoting Bullock's rehabilitation and protecting the public, the district court explained that this condition was "warranted and justified based on [Bullock's] possession of a large number of images of minors, which did not explicitly constitute child pornography but nevertheless depict[ed] minors in a manner indicative of sexual interest in children." *Id.* at 165.

Bullock timely appealed.

## DISCUSSION

On appeal, Bullock argues that the district court erroneously applied § 2G2.2(b)(5)'s pattern of abuse enhancement, imposed a substantively

11

unreasonable sentence, and procedurally erred in imposing Special Conditions One, Two, Five, and Seven.  We disagree and affirm Bullock's sentence in its entirety.

## I.    Pattern of Abuse Enhancement

Bullock contends that the district court erred in applying U.S.S.G. § 2G2.2(b)(5) because, *inter alia*, his abuse of Victims 1 and 2 did not constitute a pattern of activity, meaning two or more separate instances of sexual abuse.[4]  A district court commits procedural error in arriving at a sentence "when it, *inter alia*, makes a mistake in its Guidelines calculation."  *United States v. Taylor*, 961 F.3d 68, 74 (2d Cir. 2020) (quoting *United States v. Yilmaz*, 910 F.3d 686, 688 (2d Cir. 2018) (per curiam)).  "Where a defendant has preserved a challenge to a sentencing enhancement, we apply a mixed standard of review to assess whether the district court properly applied the enhancement."  *United States v. Esteras*, 102 F.4th 98, 104 (2d Cir. 2024).  "We first review the district court's factual findings for clear error, which we will find only where the record as a whole leaves us 'with the definite and firm conviction that a mistake has been committed.'"  *Id.* (citation omitted)

---

[4] Although Bullock does not meaningfully contest on appeal that the abuse of both children occurred, he argues that the district court erred in relying on Victim 2's interview as a basis for its factual findings.  Appellant's Br. at 35.  But even assuming, as Bullock argues, that the four-year-old's interview should not have been consulted, we discern no clear error in the district court's factual findings, particularly because Bullock explicitly told police that he touched Victim 2's penis.

(quoting *United States v. Cuevas*, 496 F.3d 256, 267 (2d Cir. 2007)). "We then review de novo the district court's ultimate legal determination as to whether those factual findings support an enhancement under the Guidelines." *Id.*

U.S.S.G. § 2G2.2(b)(5) provides for the increase of a defendant's offense level by five levels "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." Section 2G2.2's commentary defines a "[p]attern of activity involving the sexual abuse or exploitation of a minor" as "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." U.S.S.G. § 2G2.2 cmt. n.1. Bullock argues that the district court misapplied the Guidelines because his abuse of Victim 1 and Victim 2 did not constitute two "separate instances" of abuse. We disagree.[5]

Bullock relies primarily on the Supreme Court's decision in *Wooden*. In that case, the Court construed 18 U.S.C. § 924(e)(1), the provision of the Armed Career

---

[5] The parties also dispute factual questions related to whether the abuse of the two children occurred on the same day and whether one victim was abused multiple times. We need not resolve these questions, as even assuming the version of the facts most favorable to Bullock—that each victim was abused once and on the same day—the district court did not err in concluding his conduct satisfied the requirements of § 2G2.2(b)(5).

Criminal Act that mandates a 15-year minimum sentence for unlawful gun possession when the offender has three or more prior convictions for violent felonies, including burglary, "committed on occasions different from one another." *Wooden*, 595 U.S. at 363 (quoting 18 U.S.C. § 924(e)(1)). Wooden had 10 prior burglary convictions, all based on one night of criminal conduct during which he broke into a single storage facility and stole items from 10 different storage units. *Id.* at 362–63. The Court concluded that the defendant's 10 predicate burglary convictions occurred on a single criminal "occasion" and thus Wooden was not subject to § 924(e)(1)'s mandatory minimum. *Id.* at 376.

Bullock argues that the Court's analysis in *Wooden* supports the conclusion that his sexual abuse of two children on the same day, following services, constituted one instance of sexual abuse. The government contends that *Wooden* is inapposite but that if its analysis applied, it would favor the government's position rather than Bullock's. While *Wooden* might not directly control, it is instructive. Drawing upon its analysis by analogy, we agree with the government that *Wooden* supports the conclusion that Bullock engaged in two separate instances of sexual abuse.

14

The government contends that *Wooden* is inapposite because it involved a different provision with a different operative term—"occasion" there, "instance" here—and the ordinary meaning of "instance" is narrower than "occasion." In *Wooden*, the Court noted that "[t]he word [occasion] commonly refers to an event, occurrence, happening, or episode." *Wooden*, 595 U.S. at 367 (citing American Heritage Dictionary 908 (1981) and Webster's Third New International Dictionary 1560 (3d ed. 1986)). An "instance," which the Sentencing Guidelines do not define, is commonly understood to mean "a step, stage, or situation viewed as part of a process or series of events" or "an occasion or period defined by certain events." Webster's Third New International Dictionary 1171 (3d ed. 1986); *see also* American Heritage Dictionary 666 (2d ed. 1982) ("A step in a process.").

Although "instance" and "occasion" may not always convey precisely the same meaning, their meanings in this context are sufficiently similar that the Supreme Court's analysis in *Wooden* is relevant. The dictionary on which the Supreme Court relied in *Wooden*—the most current dictionary in wide circulation at the time § 2G2.2(b)(5) was adopted—defines "instance" as "an *occasion* . . . defined by certain events." Webster's Third New International Dictionary 1171 (3d ed. 1986) (emphasis added). And it is difficult to see how the

15

meaning of § 2G2.2(b)(5) would change if it referred to "occasions" rather than "instances." Indeed, the commentary to Guidelines provisions addressing sexual misconduct use "occasion" and "instance" interchangeably when defining a "pattern of activity."[6]

We therefore consider *Wooden* and conclude that the Court's analysis supports the government's position. The *Wooden* Court recognized that "a range of circumstances may be relevant to identifying episodes of criminal activity," that the inquiry is "intuitive" and "multi-factored," and that in many cases a single factor may determine the outcome. 595 U.S. at 369–70. The Court relied on three factors to decide whether the burglary offenses in that case occurred on different occasions: (1) whether the offenses were "committed close in time, in an uninterrupted course of conduct"; (2) whether they occurred in close geographic "[p]roximity" to each other; and (3) whether "the character and relationship of the offenses" suggested that they were "intertwined," sharing "a common scheme or purpose." *Id.* at 369. Wooden's 10 burglary convictions, the Court concluded,

---

[6] Take, for example, U.S.S.G. § 4B1.5(b)(1), which provides for a five-level upward adjustment in certain cases where "the defendant engaged in a pattern of activity involving prohibited sexual conduct." Section 4B1.5's commentary explains that a defendant has engaged in such a "pattern of activity" if on "at least two separate *occasions*, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G. § 4B1.5 cmt. n.4(B)(i) (emphasis added). And § 4B1.5(b)(1) was added to the Guidelines to provide an adjustment in the context of prohibited sexual conduct "similar to the existing five-level pattern of activity enhancement in [§ 2G2.2(b)(5)]." U.S.S.G. App'x C (Vol. II) amend. 615.

were all "components of the same criminal event" because they involved "a single uninterrupted course of conduct" that "took place at one location" and "were part and parcel of the same scheme, actuated by the same motive, and accomplished by the same means." *Id.* at 369–70. "Indeed," the Court noted, "each burglary in some sense facilitated the next, as Wooden moved from unit to unit to unit, all in a row." *Id*. at 370.

The *Wooden* Court emphasized that the defendant's burglaries of one storage unit after another were committed in a "single uninterrupted course of conduct," reflecting no gaps in time or significant intervening events. *Id.* at 369–70. But Bullock's crimes *were* separated by time and by intervening non-criminal conduct: Bullock took Victim 1 to the pastor's office and molested him there before leaving both Victim 1 and the pastor's office to join the church's assistant treasurer in a different room to count money that had been donated to the church. Later that day, Bullock abused Victim 2 in a classroom.

Bullock argues that he engaged in only one instance of sexual abuse because both of his crimes occurred at the same location: the church. But Bullock molested his victims in different rooms within the church: Victim 1 in the pastor's office and Victim 2 in a church classroom. To be sure, *Wooden* also involved crimes

17

committed in different parts of the same building. *Id.* at 370. But courts must consider proximity in light of "the character and relationship of the offenses," and the Supreme Court has cautioned that "no particular lapse of time or distance" is required to "separate[] a single occasion from distinct ones." *Erlinger v. United States*, 602 U.S. 821, 841 (2024) (internal quotation marks omitted). In *Wooden*, the defendant's criminal purpose was to burglarize the whole storage facility as he "moved from unit to unit to unit, all in a row." 595 U.S. at 370. In contrast, Bullock's crimes were not part of a single scheme directed at the church building. The fact that Bullock abused his two victims in two different rooms at two different times—with non-criminal conduct separating the acts of abuse—indicates that his crimes involved two separate instances of abuse.

The third factor—"the character and relationship of the offenses"—also weighs in favor of concluding that Bullock engaged in two separate instances of abuse. *Id.* at 369. In describing this factor, *Wooden* explains that "[t]he more similar or intertwined the conduct giving rise to the offenses—the more, for example, they share a common scheme or purpose—the more apt they are to compose one occasion." *Id.* But the relevant inquiry as to this factor is not, as Bullock argues, merely whether the crimes involved the same motive or objective. Rather, the

18

inquiry focuses on whether the defendant's conduct fell within the scope of a single overarching scheme, so that each crime was but a "component[] of the same criminal event." *Id.* In *Wooden*, the Court emphasized that "[e]ach offense was essentially identical, and all were intertwined with the others. The burglaries were part and parcel of the same scheme, actuated by the same motive, and accomplished by the same means." *Id.* at 370. By contrast, the opportunistic abuse of two individual victims, at different times and different locations—and punctuated by the unrelated conduct of counting church money—does *not* reflect an overarching scheme that amounts to a single instance of sexual abuse. Rather, Bullock's conduct reflects two distinct choices to abuse two different children. We conclude that the district court correctly applied § 2G2.2(b)(5).

## II.  Substantive Reasonableness

Bullock next challenges the substantive reasonableness of his 97-month sentence. Sentences will be set aside for substantive unreasonableness "only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (quoting *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)). And while we do "not presume that [Guidelines] sentences are reasonable," *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010), "[i]n the overwhelming majority of cases,

a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances," *United States v. Alcius*, 952 F.3d 83, 88 (2d Cir. 2020) (per curiam) (quoting *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011)).  This is one such normal case.

Although Bullock's sentence was at the bottom of the applicable Guidelines range, he argues that it was nonetheless unreasonable because the district court (1) failed adequately to consider that he was an "atypical child pornography offender," Appellant's Br. at 34; (2) conducted an erroneous assessment of his "dangerousness," *id.* at 37; and (3) ignored the fact Bullock had been incarcerated during the COVID-19 pandemic.  We disagree.

The Guidelines already account for the circumstances that Bullock claims make him an atypical child pornography defendant.  Bullock argues that the district court failed to consider that he possessed fewer pornographic images than the average defendant.  But the Guidelines provide for offense level enhancements based on the number of images the defendant possessed.  Had Bullock possessed more than 150 images, his offense level would have been one to three levels higher. *See* U.S.S.G. § 2G2.2(b)(7).  Bullock argues that the district court ignored his lack of distribution of child pornography.  But the Guidelines account for that too.  If

Bullock *had* distributed child pornography, his offense level would have been

between two and seven levels higher, depending on the details of the distribution.

U.S.S.G. § 2G2.2(b)(3).

Bullock separately contends that the district court erred in its assessment of

his dangerousness by considering his voluntary pursuit of sex offender treatment

and misinterpreting his allocution. We again disagree.

Although a defendant's efforts to obtain treatment may be a relevant

mitigating factor in an appropriate case, it was not unreasonable here for the

district court, in evaluating Bullock's risk of future recidivism, to note that Bullock

had continued to view inappropriate images of children both after inpatient

treatment and during outpatient treatment before his arrest. Bullock even

admitted to the district court that he had started looking at images of children

again because he "was not under the duress of the threat of prosecution," which

amounted to a concession that he posed a high risk of recidivism. App'x 160.

Nor does the record demonstrate any misinterpretation of Bullock's

allocution. "District courts are generally best placed to evaluate testimony in light

of the witnesses' demeanor." *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004); *see*

*also United States v. Strange*, 65 F.4th 86, 89 (2d Cir. 2023) ("Because the sentencing

court is in a unique position to evaluate a defendant's acceptance of responsibility, its determination is entitled to great deference on review.") (internal quotation marks omitted). In addressing the district court, Bullock declined to take responsibility for possessing child pornography or for abusing Victim 1 and Victim 2. He told the court that notwithstanding his offenses, he had "never been accused of mistouching, mishandling anyone," App'x 158, and he described his molestation of these victims as "actions I may have taken back in 2014," *id.* at 157–58. Bullock told the district court that the images depicting the sexual abuse of children were "found somehow" by him. *Id.* at 159. He acknowledged that viewing explicit images of children in public libraries "offended people in those libraries . . . *even if no law was broken*" and described his motives for doing so as "not pure, but let's say legal, per se." *Id.* at 160 (emphasis added). He said that he hoped in the future not to visit websites "that have any of those kind of images, *whether they're defendable or not*." *Id.* (emphasis added).

Bullock admits in his briefing on appeal that he "engaged in a bit of spin-doctoring" in discussing his child pornography offenses. Appellant's Br. at 39. That is an understatement. The district court was entitled to rely on Bullock's rationalizations, as well as its interpretation of Bullock's tone and demeanor, in

22

concluding that he lacked remorse and posed a danger to the public. *See United States v. Broxmeyer*, 699 F.3d 265, 295 (2d Cir. 2012) (affirming a sentence based in part on the district court's finding that the defendant's allocution at sentencing demonstrated a lack of remorse). We see no substantive unreasonableness in that conclusion.

Bullock also argues that the district court failed to consider that he had been incarcerated during the height of COVID-19 and imposed a substantively unreasonable sentence as a result. But Bullock's counsel argued to the district court that his client's incarceration during the pandemic warranted a shorter sentence. And the district court stated that it had "reviewed and considered all the pertinent information including . . . submissions by counsel." App'x 162–63. "[A] district court is not required to 'precisely identify . . . specific arguments bearing on" its sentence. *United States v. Carter*, 489 F.3d 528, 541 (2d Cir. 2007) (emphasis omitted) (quoting *United States v. Fernandez*, 443 F.3d 19, 29 (2d Cir. 2006)). The fact that the district court did not specifically reference Bullock's COVID-19 argument at sentencing does not render his sentence substantively unreasonable. Nor did the fact of Bullock's incarceration during the pandemic require the district court to shorten his sentence.

23

### III.    Conditions of Supervised Release

Bullock also challenges special conditions of supervised release limiting his contact with children (Special Conditions One and Two), restricting him to possessing a single internet-capable device (Special Condition Five), and prohibiting him from viewing or possessing material depicting sexually explicit conduct (Special Condition Seven).[7]   A district court may impose any special condition of supervised release that "it considers to be appropriate" "to the extent that such condition . . . (1) is reasonably related to" certain statutory factors, (2) "involves no greater deprivation of liberty than is reasonably necessary," and (3) "is consistent with any pertinent policy statements issued by the Sentencing Commission."   18 U.S.C. § 3583(d).   We generally "review the imposition of conditions of supervised release for abuse of discretion and any related legal rulings de novo." *United States v. Eaglin*, 913 F.3d 88, 94 (2d Cir. 2019).   "When the defendant does not object to the conditions, however, we review only for plain error." *United States v. Green*, 618 F.3d 120, 122 (2d Cir. 2010) (per curiam).

---

[7] In the context of challenging these conditions, Bullock alludes briefly to the 20-year duration of his supervised release.  To the extent Bullock seeks to challenge the reasonableness of his term of supervised release, his only argument is a citation to *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017). *Jenkins*, however, is inapposite, given the fact—which we explicitly emphasized in that case—that "Jenkins never contacted or attempted to contact any minors." *Id.* at 194.  Here, Bullock molested two children.  On this record, we find nothing unreasonable about the district court's decision to impose a 20-year term of supervised release.

In this case, Bullock waived a reading of the conditions that were attached to the PSR and concedes that his defense counsel did not raise any objections to the district court. We thus review for plain error, which requires the appellant to demonstrate that "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)); *see also United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (noting "reversal for plain error should 'be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982))). We discern no error as to Bullock's special conditions of supervised release, much less error that is plain.

## A. Limitations on Contact with Children

The district court imposed two conditions restricting Bullock's contact with children. Special Condition One prohibits Bullock from having "direct contact with any child [he] know[s] or reasonably should know to be under the age of 18 without the permission of the probation officer" and requires him to report within

25

24 hours any such contact he does have. App'x 17. Special Condition Two prohibits Bullock from going to or remaining at "any place where [he] know[s] children under the age of 18 are likely to congregate, including parks, schools, playgrounds, and childcare facilities without the permission of the probation officer." *Id.* The district court explained that these conditions were justified based on Bullock's offense conduct, his history and characteristics, the need to protect the public, and the need to promote Bullock's rehabilitation. This conclusion is fully supported by the record, which reveals that Bullock has a long history of viewing inappropriate images of children—including in public—and has abused children.

Bullock argues that the district court erred in applying these conditions given the remoteness of the instances in which he physically abused children. We disagree. "Our caselaw is clear that a district court retains wide latitude in imposing conditions of supervised release." *United States v. Lewis*, 125 F.4th 69, 75 (2d Cir. 2025) (alteration adopted) (internal quotation marks omitted). And our caselaw is clear that conditions requiring defendants not to associate with minors and to avoid locations where minors congregate are permissible in appropriate cases. *See United States v. MacMillen*, 544 F.3d 71, 75–76 (2d Cir. 2008).

26

We do not think the district court erred by declining to discount Bullock's 2014 conduct based on the passage of time. We have approved of a district court's consideration of instances of prior child abuse that were remote in time. *See United States v. Dupes*, 513 F.3d 338, 343–44 (2d Cir. 2008) (affirming similar conditions of supervised release imposed in part based on an offense committed eight years earlier); *see also United States v. Fields*, 777 F.3d 799, 803 (5th Cir. 2015) (upholding a restriction on association with minors relying in part on an offense 25 years earlier). The district court acted in accordance with that precedent by taking account of Bullock's abuse of Victim 1 and Victim 2 when deciding to limit Bullock's contact with minors while he is on supervised release.

## B. Limitation to One Internet-Capable Device

Bullock next challenges Special Condition Five, which limits him "to possessing one personal internet-capable device" "[u]nless otherwise approved by the Court." App'x 17. We have acknowledged that a restriction limiting a supervisee to just one internet-connected device poses a significant burden for which a court should make "particularized on-the-record findings." *United States v. Kunz*, 68 F.4th 748, 767 (2d Cir. 2023). At the same time, "[t]he specific obligation to state on the record the reason for imposing a special condition is merely a subset of the broader requirement to 'state in open court the reasons for . . . the particular

27

sentence.'" *United States v. Lawrence*, 139 F.4th 115, 124 (2d Cir. 2025) (quoting 18 U.S.C. § 3553(c)). Accordingly, as with sentences generally, *see Rita v. United States*, 551 U.S. 338, 356 (2007), we leave to the district court's judgment the "appropriateness of brevity or length" in setting forth its reasons for imposing a special condition, *id*; *see also Jenkins*, 854 F.3d at 194 (noting that district courts are "under no obligation to provide elaborate reasons for the sentence[s] [they] impose[]"). As we recognized in *Kunz*, "[w]e have never required district judges to perform the obvious," 68 F.4th at 760, and "'[t]he court [is] under no obligation . . . to pick through every condition and explain, point-by-point, how each was responsive to the offending conduct,'" *United States v. Thompson*, 143 F.4th 169, 178 (2d Cir. 2025) (quoting *Kunz*, 68 F.4th at 760).

Here, the district court sufficiently justified the one-device limitation with particularized on-the-record findings. The district court explained that this and other special conditions, such as those limiting Bullock's contact with children, were related not only to Bullock's history and characteristics, but were necessary to promote his rehabilitation and to protect the public, as demonstrated by his offense conduct. The district court explained how Bullock "possess[ed] numerous devices, including computers and thumb drives that [he] used to commit the

28

instant offense." App'x 165–66. Bullock even suggested in his own allocution that he should be limited in his access to computers. He told the court how he "voluntarily gave up a lucrative career in engineering" in 2018 "knowing that it needed use of a computer" because he desired "to not put [him]self in that position of using a computer but just to be able to return to a place where [he] can be a functioning, contributing member of society and to not be in a position to cause further harm." *Id*. at 161.

We also note that the district court imposed the one-device condition by adopting the recommendation of the PSR. We have explained that in such circumstances "our assessment of the procedural reasonableness of a condition of supervised release looks to '[t]he district court's comments, *as well as the PSR's . . . justifications* for the application of [the] condition.'" *Lawrence*, 139 F.4th at 124 (quoting *United States v. Bryant*, 976 F.3d 165, 184 (2d Cir. 2020)). Even in the context of conditions that impose a significant burden on a supervisee's liberty, "[a]dopting the PSR . . . states the court's reasons [for imposing a special condition] in open court because the PSR provides the grounds for the sentence imposed." *Id.* Here, the PSR makes clear that Bullock used personal, work, and public library computers to access inappropriate images of children and that he maintained a

spreadsheet to keep track of the internet searches that had resulted in his discovery of preferred images.

The district court's comments at sentencing and the PSR's justifications for the single-internet capable device condition, adopted by the district court, satisfy the district court's obligation to make particularized on-the-record findings. We conclude that the district court did not err by imposing this condition.

**C.      Prohibition on Viewing or Possessing Sexually Explicit Material**

Finally, Special Condition Seven requires that Bullock "not view, possess, own, subscribe to or purchase any material . . . that depict[s] sexually explicit conduct." App'x 17. We have held that prohibitions on such material "must be supported on the record by detailed factual findings establishing that the proposed ban is reasonably related to the sentencing factors set forth in 18 U.S.C. § 3553(a) and that it is reasonably necessary to accomplish their objectives." *Eaglin*, 913 F.3d at 99. Here, the district court stated that prohibiting Bullock from viewing or possessing material depicting sexually explicit conduct was "warranted and justified based on [Bullock's] possession of a large number of images of minors, which did not explicitly constitute child pornography but nevertheless depict[ed] minors in a manner indicative of sexual interest in children." App'x 165. Bullock argues this explanation was insufficient. We disagree.

The district court again adopted the challenged condition from the PSR, so we consider both the district court's comments and the PSR's justification for the condition in assessing Bullock's procedural reasonableness challenge. *Lawrence*, 139 F.4th at 124. Here, the district court correctly noted that Bullock has an established history of searching the internet for images that might not constitute child pornography but that would be of interest to individuals sexually attracted to children. And during his allocution, Bullock explained that his search for such images led him to possess child pornography. Bullock admitted he "had an attraction to younger children," but he claimed to have recognized that "abuse was taking place in [the] production of certain kinds of images" and that he "deliberately steered away from those images." App'x 158-59. While Bullock allegedly attempted to avoid child pornography, he did "not deny[] the fact that there remained some images that [he] found somehow that portrayed despicable and abusive treatment of children." *Id*. at 159. The PSR also reports that when Bullock began looking at sexually explicit material on the internet in 2014, the images he sought out at first were not child pornography but nude images.

The district court reasonably concluded that its imposition of Special Condition Seven, along with the other special conditions, was "necessary to

promote [Bullock's] rehabilitation and protect the public." *Id*. at 165; *see Eaglin*, 913 F.3d at 99 (suggesting that similar special conditions may be appropriate where the court "connect[s] the need for th[e] condition to the defendant's likelihood of recidivism or to another sentencing factor"). Relying on the sentencing record and the PSR, the district court's imposition of Special Condition Seven was adequately explained in light of the concern that Bullock might transition from legal images to illegal ones. *See United States v. Simmons*, 343 F.3d 72, 82 (2d Cir. 2003) (affirming a similar condition when the district court "conclude[d] that there was a connection between [the defendant's] viewing and possessing sexually explicit material and his criminal behavior"). We conclude that in the circumstances of this case, the district court's explanation for imposing a restriction on Bullock's access to sexually explicit depictions was sufficient.

## CONCLUSION

We conclude that Bullock engaged in two separate instances of sexual abuse and the district court properly applied U.S.S.G. § 2G2.2(b)(5)'s pattern of abuse enhancement. We also conclude that Bullock's sentence was substantively reasonable and that the district court did not err by imposing the challenged special conditions of supervised release. We AFFIRM the judgment of the district court.